UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

| | | |
|---|---|---|
| JOSE LUIS GARZA, *et al*, | § | |
| | § | |
| Plaintiffs, | § | |
| VS. | § | CIVIL ACTION NO. 7:16-CV-00558 |
| | § | |
| CITY OF DONNA, | § | |
| | § | |
| Defendant. | § | |

## OPINION

The Court now considers the City of Donna's ("Defendant") motion for summary judgment[1] and motion to disqualify and preclude the testimony of Mr. Donald L. Leach, II ("Leach").[2] The Court also considers the responses filed by Jose and Veronica Garza, individually and as representatives of the estate of Jose Garza, Jr. ("Deceased"), as well as Cynthia Lopez as next friend of Jose Ruben Garza, Deceased's minor son (collectively "Plaintiffs").[3] After duly considering the record and relevant authorities, the Court **GRANTS** Defendant's motion for summary judgment, and **DENIES AS MOOT** Defendant's motion to disqualify and preclude Leach's testimony.

### I.   BACKGROUND

#### A.   *Factual Background*

This case tragically arises because Decedent committed suicide while in the City of Donna Jail ("Jail").[4] Plaintiffs allege that Decedent "ha[d] a long history of substance abuse involving both alcohol and licit and illicit drugs," including cocaine, dating back to when

---

[1] Dkt. No. 33.
[2] Dkt . No. 34.
[3] Dkt. Nos. 35 & 36.
[4] Dkt. No. 10 p. 1 (the facts herein are presented from Plaintiffs' complaint, or in the light most favorable to Plaintiffs' complaint).

Decedent was fourteen years old.[5] Plaintiffs further allege that Decedent's substance abuse "led to numerous arrests on drug and alcohol-related charges."[6]

On at least three to four previous occasions,[7] Decedent was "argumentative towards his family members when intoxicated . . . such that he presented a threat of harming both himself and others."[8] As a result, Plaintiffs allege that they "telephoned Defendant's City of Donna Police Department [("Police")], and requested that Decedent be kept in a safe environment to 'dry out', i.e. placed in protective custody until the intoxication had worn off."[9] Plaintiffs further allege that the Police would honor these requests, and "would release Decedent from protective custody when [Decedent] sobered up, without filing any charges against him."[10] Notably, the Jail was and is a short-term holding facility, where detainees are only held until they can be taken before a magistrate for arraignment.[11] The Chief of Police Ruben De Leon ("Ruben") indicates that "we're really shooting at six hours or less."[12]

Early in the morning on February 19, 2016, Decedent was again intoxicated and became argumentative with his brother Gilbert and his mother Veronica Garza ("Veronica").[13] Veronica was afraid Decedent would try to fight Gilbert, and thus, was afraid for both Decedent's and Gilbert's safety.[14] She phoned the Police for help[15] specifically because Decedent "was not behaving."[16] Officer Mario Silva ("Silva") was dispatched at approximately 5:35 a.m.,[17] and

---

[5] Dkt. No. 10 ¶ 7.
[6] *Id.*
[7] *Id.* ¶ 8.
[8] *Id.*
[9] *Id.*
[10] *Id.*
[11] Dkt. No. 35-4 pp. 35.
[12] *Id.* p. 36.
[13] Dkt. No. 35-3 pp. 10–11.
[14] *Id.* pp. 15–16, 20, 22.
[15] *Id.* pp. 20–21.
[16] *Id.* p. 10.
[17] Dkt. No. 35-8 p. 18.

arrived at Veronica's residence at approximately 5:40 a.m.[18] Eventually, two other officers arrived to assist Silva: Sergeant Esmerelda Estrada ("Estrada")[19] and Officer Jacob Cepeda ("Cepeda").[20] Silva observed Decedent's bloodshot eyes, slurred speech, lack of balance, and alcoholic odor.[21]

At some point in time, Veronica claims to have told Silva and Estrada that she believed Decedent might hurt himself.[22] Veronica *might* have also told a male officer that she "feared for [Decedent's] life," although it is not clear from the wording and context of this statement whether it was actually spoken, or simply how Veronica felt.[23] However, Veronica's deposition reveals that she is not aware Decedent ever told anybody that he might commit suicide.[24]

Ultimately, Silva arrested Decedent for assault by threat.[25] There is no indication Estrada or Cepeda took part in the arrest or booking process of Decedent. Silva testified that he believed Decedent was no longer a danger to himself or anyone else after being arrested.[26] Moreover, Silva testified that throughout the process, Decedent was compliant and "talking to [Silva] the entire way."[27] Decedent did not have any violent outbursts[28] and was eventually booked at approximately 6:05 a.m., upon arriving at the Jail.[29] According to Silva, during booking, Decedent's demeanor was "okay," and they "even had a couple of laughs."[30] In any event, there

---

[18] Dkt. No. 35-3 p. 23 (indicating officers arrived approximately five minutes after Veronica called them).
[19] Dkt. No. 35-8 p. 83.
[20] *Id.* p. 84.
[21] *Id.* pp. 22–23.
[22] Dkt. No. 35-3 pp. 35–36 (indicating Veronica was afraid Decedent might hurt himself or Gilbert specifically because he could be violent when intoxicated); *id.* p. 83 (indicating Veronica expressed her concern that Decedent might hurt himself to Silva and "the female officer").
[23] *Id.* p. 25 ("And then he told me, [y]ou want to press charges? I told him, [n]o. I loved him. I loved him. I feared for his life.").
[24] *Id.* p. 63.
[25] Dkt. No. 35-8 p. 20.
[26] *Id.* pp. 22–23.
[27] *Id.* pp. 42–43.
[28] *Id.* p. 45.
[29] *Id.*
[30] *Id.* p. 33.

was "[n]o indication [Decedent] wanted to harm himself."[31] Ultimately, Silva did not believe Decedent would harm himself.[32]

Defendant has no policy requiring suicide screenings for all pretrial detainees. Instead, Defendant requires arresting officers and Jail personnel to seek medical or mental screening and assistance for arrestees/detainees if they see a specific need for it.[33] There is no indication in the record that Silva requested mental screening for Decedent.

Instead, after booking Decedent, Silva entered the "squad room" for approximately forty minutes (until 6:45 a.m.) to type up his report,[34] and left the Jail to go home before 7:00 a.m.[35] Silva understood that Communications Supervisor Minerva Perez ("Perez") would monitor Decedent in his Jail cell via video feed.[36] However, Silva—now working well past the end of his 6:00 a.m. "graveyard" shift—did not know which jailer(s) would oversee Decedent, and had no contact with any jailers that morning.[37] Silva states he was careful to ensure Decedent was not harmed.[38]

Perez arrived at approximately 6:00 a.m. that morning,[39] around the same time Decedent was booked. Perez's duties included answering 911 calls,[40] dispatching police and the fire department,[41] checking license plates and confirming the existence of outstanding warrants,[42] as well as monitoring the video feed from Jail cells.[43] She was not allowed to check on detainees in-

---

[31] *Id.*

[32] *Id.* pp. 42–43.

[33] Dkt. No. 35-4 pp. 26, 27–28, 40–41, 48–50.

[34] Dkt. No. 35-8 pp. 80 & 90.

[35] *Id.* p. 60 (indicating Silva left the Jail within one hour of booking Decedent).

[36] *Id.* p. 53.

[37] *Id.* pp. 52–53 & 36.

[38] *Id.* p. 65.

[39] Dkt. 35-9 p. 35.

[40] *Id.* pp. 26–27

[41] *Id.*

[42] *Id.*

[43] *Id.* pp. 27–28.

person.[44] Perez states that it was only her job to monitor prisoners via video feed when there are no jailers on duty.[45] Moreover, the layout of Perez's office was such that she could not take 911 calls and monitor the video feeds at the same time.[46]

Perez states that upon arriving to work on the morning in question, she was informed by a Mr. Jay Rodriguez that there was a detainee in custody.[47] However, Perez also states that she was not aware that the detainee was a "mental patient,"[48] that she did not know who arrested Decedent,[49] and that she was not told any specifics about the detainee.[50] Regardless, Perez testifies that she monitored Decedent via video feed upon arriving to work (at 6:00 a.m.) until between 7:00 a.m. and 8:00 a.m., when jailers first began arriving.[51]

Perez claims she was busy answering approximately twenty 911 calls that morning from between 6:00 a.m. to 9:00 a.m.[52] Plaintiffs contest this figure, suggesting it was far lower, and reference "Exhibit 25," which supposedly contains a photograph of a 911 call log.[53] However, there are no documents marked "Exhibit 25" in the record. Moreover, the only photograph of a log contained in the record—marked "Exhibit 84"—contains twenty-two entries between the times "08:09:50 a" and "08:57:31 a."[54] Even assuming only some of these call were 911 calls, it fails to include any call information from 6:00 a.m. to 8:09:50 a.m. Thus, the evidence does not reasonably support Plaintiffs' contention that Perez answered far fewer than twenty calls between 6:00 a.m. and 9:00 a.m. that morning.

---

[44] *Id.* p. 41.
[45] Dkt. No. 35-9 p. 37.
[46] *Id.* pp. 51–52 & 82.
[47] *Id.* p. 58.
[48] *Id.* p. 31.
[49] *Id.* p. 90.
[50] *Id.* p. 59.
[51] *Id.* p. 65.
[52] *Id.* p. 50.
[53] Dkt. No. 35 pp. 43 & 106.
[54] *See* Dkt. No. 35-26.

Regardless of the reasons, Perez testified that she never noticed Decedent's Jail cell camera had been obscured.[55] Ultimately, after Decedent had been found hanging, Perez called emergency medical services at the request of a jailer.[56] Perez testifies that she believes jail deaths are "tragic,"[57] that ensuring detainees are safe is "important,"[58] and that the lives of detainees are valuable.[59] However, Perez also admits that she did not believe she could handle all the tasks assigned to her simultaneously[60] and that she may have had too much on her plate.[61]

Two jailers arrived that morning at approximately 8:00 a.m.—jailers Esteban Garza ("Garza")[62] and Nathan Coronado ("Coronado").[63] Garza was the senior jailer with eight years of experience,[64] and Coronado was a relatively new jailer. Garza notes that no detainee had ever committed suicide at the Jail during his eight-year tenure,[65] and this is bolstered by Ruben's attestation that the Jail had never previously experienced a suicide in its forty-five year history.[66] Interestingly, Garza claims to have personally known Decedent from elementary and high school,[67] that he considered Decedent a "friend,"[68] and Decedent would wash his car sometimes.[69] In any event, it was official policy for jailers to check on detainees at least once an hour.[70]

---

[55] Dkt. No. 35-9 pp. 49 & 54.
[56] *Id*. p. 57.
[57] *Id*. p. 101.
[58] *Id*. p. 64.
[59] *Id*. p. 116.
[60] *Id*. pp. 101–102.
[61] *Id*. p. 95.
[62] Dkt. No. 35-10 p. 13.
[63] Dkt. No. 35-7 p. 18.
[64] Dkt. No. 35-10 p. 15.
[65] *Id*.
[66] Dkt. No. 35-4 pp. 42 & 45.
[67] *Id*. p. 29.
[68] *Id*. p. 37.
[69] *Id*.
[70] *Id*. pp. 18 & 24; Dkt. No. 35-6.

Garza claims he did not know Decedent was in custody until he checked the cells.[71] Coronado learned about the detainee from Garza.[72] Garza and Coronado claim to have made a cell check on Decedent at approximately 8:10 a.m. to assess Decedent's well-being.[73] Both Garza and Coronado testify that they saw water on Decedent's cell floor,[74] and Coronado claims he planned to get Decedent a mop to clean it up,[75] but this apparently never transpired. Plaintiffs sharply contest that the 8:10 a.m. cell check ever occurred, noting that the video footage does not support it and also that the 8:10 a.m. cell check Jail log was back-dated.[76] Regardless of whether a cell check was made, Garza acknowledges that he heard Decedent making noises in his cell.[77] Indeed, video footage reveals Decedent intermittently hitting and kicking the metal mesh screening of his Jail cell door with the palms of his hands, and sometimes with his feet.[78]

Video footage also reveals that after arriving to work at 8:00 a.m., Garza worked on signs to mount in the Jail.[79] Coronado confirms that he also worked on signs that morning along with Garza.[80] Immigrations and Customs Enforcement ("ICE") agents arrived at the Jail at 8:48 a.m. (presumably to determine the immigration status of detainees), checked the cells at 8:49 a.m., and discovered Decedent hanging in his cell at that time.[81] The booking room footage shows that upon hearing the ICE agents' cries, one police officer immediately entered the room containing Decedent's Jail cell, while another officer ran to a different area of the booking room to grab the

---

[71] Dkt. No. 35-10 p. 15.

[72] Dkt. No. 35-7 pp. 25–26.

[73] Dkt. No. 35-10 p. 18; Dkt. No. 35-7 p. 37.

[74] Dkt. No. 35-10 p. 83; Dkt. No. 35-7 p. 46.

[75] Dkt. No. 35-7 p. 47.

[76] Dkt. No. 35 pp. 74–75;

[77] *Id*. pp. 51, 84, 86; Dkt. No. 35-10 pp. 84–88.

[78] *See* Exhibit A-19 "Jail cell" footage. Exhibit A-19 has no document number because it is a physical digital video disk. The same can bee said of Exhibits A-17, 21, and 24.

[79] *Id*. "booking room" footage; Dkt. No. 35-10 p. 111.

[80] Dkt. No. 35-7 p. 52.

[81] *See* Exhibit A-19 "booking room" footage. ICE arrival is timestamped at "9:55.01 a.m." and ICE agents enter the cell block at "9:56:46 a.m." Plaintiffs' briefing indicates this time stamp is one hour and seven minutes off. *See* Dkt. No. 35 p. 30.

Jail cell keys.[82] Garza and Coronado were both in the Jail cell room with the keys within seven seconds of hearing the ICE agents' cries for help.[83]

Thirty-nine seconds after entering the Jail cell room with keys, a jailer ran back into the booking room, apparently to call for medical assistance.[84] Sixteen seconds after this, jailers and ICE agents pulled Decedent's body into the booking room, closer to the Jail exit.[85] Jailers and ICE agents then hunched over Decedent's body to examine it, after which one of the jailers used his radio to call for assistance.[86]

ICE agents and jailers then waited thirty seconds for a Police officer to arrive and begin CPR.[87] Ultimately, Police officer ("Suarez") vigorously began performing CPR on Decedent's limp, bluish-white body[88] forty-six seconds after Decedent had been brought into the booking room,[89] and one minute, forty-eight seconds after ICE agents had first discovered Decedent's body in the Jail cell.[90] Garza was in "shock" at the site of his friend's limp body,[91] and the other jailers and ICE agents did not perform CPR on Decedent's body during the thirty-second interval between (1) bringing Decedent's body into the booking room, briefly examining his body, and radioing for assistance, and (2) the time Suarez arrived and began performing CPR. Cell phone footage shows that after Suarez started performing CPR, Police officers earnestly and

---

[82] *Id*. at "9:57:04 a.m." – "9:57:11 a.m."
[83] *Id*.
[84] *See id*. at "9:57:50 a.m."
[85] *Id*. at "9:58:06 a.m."
[86] *Id*. at "9:58:20 a.m."
[87] *Id*. at "9:58:22 a.m." (the point by which Decedent's body was brought into the booking room, examined, and a Police officer had radioed for assistance) & "9:58:52 a.m." (when Suarez arrived and actually began CPR).
[88] Dkt. No. 35-7 p. 78; Exhibit A-24 (cell phone footage of Suarez performing CPR on Decedent in the booking room).
[89] *See* Exhibit A-19 "booking room" footage at "9:58:06 a.m." (Decedent's body brought into the booking room) & "9:58:52 a.m." (Suarez begins CPR on Decedent's body).
[90] *Id*. at "9:57:04 a.m." (ICE agents call out to Police officers concerning Decedent's hanging body") & "9:58:52 a.m." (Suarez begins CPR on Decedent's body).
[91] Dkt. No. 35-10 p. 37.

continuously applied CPR to Decedent's body until it was taken away by medical professionals.[92] There is no evidence that Decedent was alive during any of this time.

Evidently, Decedent had successfully covered the camera lens in his cell with wet paper towels by 8:30 a.m.[93] and hung himself on his Jail cell door with his shirt[94] sometime between 8:30 a.m. and 8:49 a.m. (when he was discovered by ICE agents). Medical professionals—who were stationed next door to the Jail—transported Decedent to Knapp Medical Center where he was "pronounced dead at 9:12 a.m."[95] An autopsy was conducted at 2:35 p.m. that afternoon, which concluded that the cause of death was "asphyxia by hanging."[96] The autopsy report also indicated the presence of "ethanol" and "Alprazolam" in Decedent's body,[97] but does not indicate the time of death.

B.    *Procedural Background*

Plaintiffs sued Defendant in federal court on September 15, 2016,[98] claiming violations of the Fifth and Fourteenth Amendments via 42 U.S.C. § 1983,[99] the Fourth Amendment,[100] and Title II § 12132 of the ADA[101] resulting in wrongful death.[102] Defendant filed its Rule 12(b)(6) motion to dismiss all of Plaintiffs' claims except wrongful death.[103] Plaintiffs responded to the

---

[92] *See generally* Exhibit A-24.
[93] *See* Exhibit A-19 "Jail cell" footage at "8:30:50 a.m."
[94] *See* Dkt. No. 10 ¶ 16 (Plaintiffs' first amended complaint).
[95] *Id.*
[96] Dkt. No. 35-2 p. 5.
[97] *Id.*
[98] Dkt. No. 1.
[99] *Id.* ¶ 16.
[100] *Id.* ¶ 24.
[101] *Id.* ¶ 18.
[102] *Id.* ¶ 39.
[103] Dkt. No. 7 ¶¶ 1.01 & 1.02. In particular, Defendant argued that Plaintiffs' complaint failed to support any Constitutional claims against Defendant via 42 U.S.C. § 1983 because Plaintiffs failed to "identif[y] any facts that would establish a custom or practice of the City to violate their federal rights," which in turn could circumvent Defendant's Eleventh Amendment sovereign immunity. *See id.* ¶ 1.01.

motion to dismiss, but also amended their complaint as a matter of course on October 28, 2016,[104] vitiating Defendant's Rule 12(b)(6) dismissal motion.[105]

Defendant subsequently filed another Rule 12(b)(6) dismissal motion on November 7, 2016,[106] requesting only dismissal of Plaintiffs' Fourth Amendment and ADA claims.[107] Defendant did not request dismissal of Plaintiffs' Fifth and Fourteenth Amendment claims.[108] Ultimately, the Court granted Defendant's dismissal motion.[109] Defendant thereafter filed the instant motion for summary judgment with regard to Plaintiffs' remaining Fifth and Fourteenth Amendment claims.[110] Defendant also filed a motion to disqualify and preclude the testimony of Leach—Plaintiffs' expert.[111] Plaintiffs responded to both motions, which are ripe for review. The Court now turns to its analysis.

## II.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is proper when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[112] "A fact is 'material' if its resolution could affect the outcome of the action,"[113] while a "genuine" dispute is present "only if a reasonable jury could return a verdict for the non-movant."[114] As a result, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."[115]

---

[104] Dkt. No. 10.
[105] Dkt. No. 12.
[106] Dkt. No. 13.
[107] *Id.* ¶ 3.18.
[108] *Id.* ¶ 1.01.
[109] Dkt. No. 28.
[110] Dkt. No. 33.
[111] Dkt. No. 34.
[112] Fed. R. Civ. P. 56(a).
[113] *Burrell v. Dr. Pepper/Seven UP Bottling Grp.*, Inc., 482 F.3d 408, 411 (5th Cir. 2007) (internal quotation marks and citation omitted).
[114] *Fordoche, Inc. v. Texaco, Inc.*, 463 F.3d 388, 392 (5th Cir. 2006) (citation omitted).
[115] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In a motion for summary judgment, the movant bears the initial burden of showing the absence of a genuine issue of material fact.[116] In this showing, "bald assertions of ultimate facts" are insufficient.[117] Absent a sufficient showing, summary judgment is not warranted, the analysis is ended, and the non-movant need not defend the motion.[118] On the other hand, the movant is freed from this initial burden on matters for which the non-movant would bear the burden of proof at trial; in that event, the movant's burden is reduced to merely pointing to the absence of evidence.[119] The non-movant must then demonstrate the existence of a genuine issue of material fact.[120] This demonstration must specifically indicate facts and their significance,[121] and cannot consist solely of "[c]onclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation[.]"[122]

In conducting its analysis, the Court considers evidence from the entire record and views that evidence in the light most favorable to the non-movant.[123] However, rather than combing through the record on its own, the Court looks to the motion for summary judgment and response to present the evidence for consideration.[124] Parties may cite to any part of the record, or bring evidence in the motion and response.[125] By either method, parties need not proffer evidence in a form admissible at trial,[126] but must proffer evidence substantively admissible at trial.[127]

---

[116] *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[117] *Gossett v. Du-Ra-Kel Corp.*, 569 F.2d 869, 872 (5th Cir. 1978) (citation omitted).

[118] *See Celotex Corp.*, 477 U.S. at 323.

[119] *See id.* at 323–25; *see also Transamerica Ins. Co. v. Avenell*, 66 F.3d 715, 718–19 (5th Cir. 1995).

[120] *See Celotex Corp.*, 477 U.S. at 323.

[121] *See Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).

[122] *U.S. ex rel. Farmer v. City of Hous.*, 523 F.3d 333, 337 (5th Cir. 2008) (citing *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002)).

[123] *See Moore v. Willis Indep. Sch. Dist.*, 233 F.3d 871, 874 (5th Cir. 2000) (citations omitted).

[124] *See* Fed. R. Civ. P. 56(e).

[125] *See* Fed. R. Civ. P. 56(c).

[126] *See Celotex Corp.*, 477 U.S. at 324 ("We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment.").

[127] *See Bellard v. Gautreaux*, 675 F.3d 454, 460 (5th Cir. 2012) ("[T]he evidence proffered by the plaintiff to satisfy his burden of proof must be competent and admissible at trial.").

### III.   ANALYSIS

Defendant has moved for summary judgement on Plaintiffs' remaining claims: (A) Fifth Amendment Due Process and (B) Fourteenth Amendment Due Process. Defendant also specifically seeks summary judgment on Plaintiffs' wrongful death claim pursuant to the Texas Tort Claims Act. However, Plaintiffs make clear that they are not pursuing a Texas Tort Claims Act claim but rather, seek damages for the wrongful death resulting from the violations of Decedent's constitutional rights. The Court finds this to be the case, and thus only addresses the Due Process and Fourteenth Amendment alleged violations.

### A.   *Fifth Amendment Due Process*

Fifth Amendment Due Process claims are "cognizable only against a federal government actor," and thus are categorically inapplicable to municipal and state actors.[128] Plaintiffs' claims are only aimed at municipal actors and derivatively at Defendant. Thus, Plaintiffs' Fifth Amendment Due Process claim[129] necessarily fails, and Defendant's motion for summary judgment is **GRANTED** with regard to this claim.

### B.   *Fourteenth Amendment Due Process*

#### i.   *legal standard*

The Fourteenth Amendment states:

> No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, *without due process of law*; nor deny to any person within its jurisdiction the equal protection of the laws.[130]

---

[128] *Wheat v. Mass*, 994 F.2d 273, 276 (5th Cir. 1993); *see also Blackburn v. City of Marshall*, 42 F.3d 925, 930 n.3 (5th Cir. 1995) ("Blackburn also alleges that Defendants' actions violated the Fifth Amendment. Because the due process component of the Fifth Amendment applies only to federal actors, we will analyze Blackburn's claim under the Fourteenth Amendment.").

[129] Dkt. No. 10 ¶ 25.

[130] U.S. CONST. amend XIV, § 1 (emphasis added).

Importantly, the Fourteenth Amendment only applies directly against states, not municipalities—such as Defendant. However, Congress remedied this gap by enacting 42 U.S.C.A. § 1983,[131] which effectively permits Fourteenth Amendment claims to proceed against municipalities under certain circumstances.[132] Thus, Plaintiffs have employed the proper procedural vehicle for bringing their Fourteenth Amendment Due Process claim against Defendant—§ 1983.[133]

The Fifth Circuit has specifically held that a "pretrial detainee . . . ha[s] a clearly established [Fourteenth Amendment Due Process] . . . right not to be denied, by deliberate indifference, attention to his serious medical needs."[134] This includes "protection from *known* suicidal tendencies,"[135] the ostensible basis for the majority of Plaintiffs' complaints against Defendant. Although this right, as applied to convicted prisoners, is based on the Eighth Amendment, "state and municipal detainees are accorded at least as much protection under the due process clause of the [F]ourteenth [A]mendment."[136]

Pretrial-detainee Fourteenth Amendment claims may be analyzed two different ways, depending upon the underlying allegations. *First*, and most often, if the harm in question results from "a particular act or omission of one or more officials, the action is characterized as an 'episodic act or omission' case."[137] In such cases, "an actor is usually interposed between the detainee and the municipality, such that the detainee complains first of a particular act of, or omission by, the actor and then points derivatively to a policy, custom or rule (or lack thereof) of

---

[131] 42 U.S.C.A. § 1983 (West).
[132] *See Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 689–90 (1978) (providing that municipalities constitute "persons" within the meaning of 42 U.S.C.A. § 1983").
[133] Dkt. No. 10 p. 9.
[134] *Estate of Pollard v. Hood Cty., Tex.*, 579 Fed. Appx. 260, 265 (5th Cir. 2014).
[135] *Id.* (emphasis added) (citing *Flores v. Cty. of Hardeman, Tex.*, 124 F.3d 736, 738 (5th Cir.1997).
[136] *Burns v. City of Galveston, Tex.*, 905 F.2d 100, 103 (5th Cir. 1990) (citing *Bell v. Wolfish*, 441 U.S. 520 (1979)); *Revere v. Mass. Gen. Hosp.*, 463 U.S. 239 (1983).
[137] *Flores*, 124 F.3d at 738.

the municipality that permitted or caused the act or omission."[138] The legal analysis is two-fold: "the plaintiff must demonstrate: (1) that the municipal employee violated [the pretrial detainee's] clearly established constitutional rights with *subjective* deliberate indifference; and (2) that this violation resulted from a municipal policy or custom adopted and maintained with *objective* deliberate indifference."[139]

To demonstrate subjective deliberate indifference under the first prong, "the plaintiff must show that the municipal employee knew of and disregarded an excessive risk to the detainee's health or safety."[140] Specifically in the pretrial-detainee-suicide context, "a plaintiff must show that public officers were [1] aware of facts from which an inference of a substantial risk of serious harm to an individual could be drawn;[141] [2] that they actually drew the inference; and [3] that their response indicates subjective intention that the harm occur."[142] Evidence of negligence, or even gross negligence, is not enough.[143] The Fifth Circuit has explained that subjective deliberate indifference "is an extremely high standard to meet."[144]

The second prong—objective deliberate indifference of the municipality—has been summed up thus: A city acts with objective deliberate indifference "if it promulgates (or fails to promulgate) a policy or custom despite the known or obvious consequences that the constitutional violations would result."[145] Moreover, the Fifth Circuit has stated that a plaintiff must establish: "(1) an official policy (or custom), of which (2) a policymaker can be charged

---

[138] *Id.*

[139] *Brumfield v. Hollins*, 551 F.3d 322, 331 (5th Cir. 2008); *see also Sanchez v. Young Cty., Tex.*, 866 F.3d 274, 280–88 (5th Cir. 2017) (indicating that subjective and deliberate indifference of specific employee(s) must be found even in cases solely against a municipality).

[140] *Brumfield*, 551 F.3d at 331.

[141] *See Hyatt v. Thomas*, 843 F.3d 172, 178 (5th Cir. 2016) (indicating with regard to this first requirement, "[w]hether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence.").

[142] *Sanchez*, 866 F.3d at 280; *Estate of Allison v. Wansley*, 524 Fed. Appx. 963, 970 (5th Cir. 2013).

[143] *Sanchez*, 866 F.3d at 280.

[144] *Id.*

[145] *Anderson v. Dallas County Texas*, 286 Fed. Appx. 850, 861 (5th Cir. 2008).

with actual or constructive knowledge, and (3) a constitutional violation whose 'moving force' is that policy or custom."[146]

*Second*, a condition-of-confinement claim is "a constitutional attack on the general conditions, practices, rules, or restrictions of pretrial confinement."[147] Examples include complaints about the number of bunks in one's cell, one's mail privileges, the inability to bathe for two months at a time, and exposure to high levels of cancer-causing radioactivity.[148] In these cases, it is assumed the deprivation imposed by the policy was intentional, and "a constitutional violation exists only if we then find that the condition of confinement is not reasonably related to a legitimate, non-punitive government objective."[149]

The Court begins by discussing Plaintiffs' episodic act or omission theory of liability, and then turns to Plaintiffs' condition-of-confinement theory.

### ii.  *Analysis—episodic acts or omissions before Decedent was found hanging in his cell*

Neither party disputes, and both parties assume, that the present case *at least* arises from episodic acts or omissions by Defendant's employees.[150] Defendant's chief argument on this front is that there is insufficient evidence to prove any of its employees acted with subjective and deliberate indifference to any suicidal tendencies Decedent may have displayed.[151] The Court proceeds to discuss each of these employees in turn.

### a.  *Mario Silva—arresting officer*

No fact finder could reasonably infer from the available evidence that Silva was subjectively and deliberately indifferent to a known risk that Decedent would commit suicide. As

---

[146] *Fuentes v. Nueces Cty., Tex.*, 689 Fed. Appx. 775, 777 (5th Cir. 2017).

[147] *Id*.

[148] *See id*. (citing cases).

[149] *Scott v. Moore*, 114 F.3d 51, 53 (5th Cir. 1997)

[150] Plaintiffs also attempt to employ the conditions-of-confinement theory, which the Court will address in turn.

[151] Dkt. No. 33 ¶¶ 3.21–3.28.

noted, Veronica stated in her deposition that she told the police she was "afraid of [Decedent] hurting himself."[152] She also testified that she "feared for [Decedent's] life,"[153] although it is not clear if she ever communicated this specifically to Silva.

However, there is no evidence that Veronica explained to Silva *why* she believed Decedent might hurt himself. Furthermore, there is no evidence Decedent had ever expressed an intent to harm or kill himself,[154] or that Decedent had either specifically expressed an intent or actually tried to hurt himself during any of his three to four[155] previous stays in the Jail. Thus, even *assuming* Veronica told Silva that she was afraid for Decedent's life, this statement was altogether inexplicable, without any accompanying rationale or justification.

To the contrary, Silva's deposition indicates that during the arrest and booking process, Decedent's demeanor was "okay,"[156] and that he was compliant, "talking to me the whole way."[157] Decedent did not make any outbursts and the two "even had a couple of laughs" while in booking.[158] According to Silva, Decedent gave "no indication he wanted to harm himself,"[159] and thus, Silva did not believe Decedent would hurt himself.[160] On the whole, the evidence suggests Silva was—subjectively speaking—focused on detaining a rowdy and potentially violent intoxicated person,[161] rather than saving a suicide-prone subject. Plaintiffs contest that the "couple of laughs" remark should be ignored on the basis of spoliation because the booking

---

[152] Dkt. No. 35-3 p. 33.
[153] *Id*. p. 35.
[154] *See id*. p. 63.
[155] *Id*. p. 35.
[156] Dkt. No. 35-8 p. 33.
[157] *Id*. pp. 42–43.
[158] *Id*. p. 33.
[159] *Id*. pp. 42–43.
[160] *Id*. p. 63; Dkt. No. 33-1 pp. 31–32.
[161] *See e.g.*, Dkt. No. 35-3 p. 10 (Veronica called Dona Police specifically because "[m]y son was not behaving—he got argumental (sic) with my son Gilbert"); Dkt. No. 35-8 pp. 19–20 (charging Decedent with assault by threat, and stating this was the *only* reason he arrested Decedent); *id*. pp. 21–22 (finding Decedent was argumentative and threatening); *id*. (Silva was aware Decedent was intoxicated with alcohol).

room footage that could have proven or disproven it has been intentionally destroyed.[162] Even disregarding this portion of Silva's testimony, no reasonable fact finder could conclude Silva was subjectively and deliberately indifferent to any obvious suicidal tendencies.[163]

In sum, it is not possible to infer from the available evidence that Silva was subjectively aware of "a *substantial* risk of serious harm" to Decedent,[164] or that Silva actually drew an inference that Decedent would kill himself. Silva specifically stated that he did not draw any such inference.[165] Finally, Silva's response (taking no special action to prevent Decedent from committing suicide) does not indicate a "subjective intention that the [suicide] occur."[166] No fact finder could reasonably infer that Silva's course of conduct was motivated by an intent that Decedent kill himself. Thus, Silva was not subjectively and deliberately indifferent.

Plaintiffs cite a Fifth Circuit case—*Hyatt v. Thomas*[167]—and contend that Silva could be subjectively and deliberately indifferent even though nothing particular about Decedent's behavior suggested he would commit suicide.[168] Indeed, the *Hyatt* Court found the defendant was subjectively aware of a substantial risk that the decedent would commit suicide even though he indicated he did not want to commit suicide that day and otherwise appeared to be in a good mood.[169] However, that case is factually distinguishable because the defendant was: (1) apprised by decedent's spouse that decedent was suicidal, (2) aware the decedent had previously attempted suicide (including two months prior), and (3) the decedent specifically told the

---

[162] *See* Dkt. No. 35 pp. 109,
[163] *See Whitt v. Stephens Cty.*, 529 F.3d 278, 284 (5th Cir. 2008).
[164] *Hyatt v. Thomas*, 843 F.3d 172, 178 (5th Cir. 2016).
[165] Dkt. No. 33-1 pp. 31–32.
[166] *Sanchez v. Young Cty, Tex.*, 866 F.3d 274, 280 (5th Cir. 2017); *Estate of Allison v. Wansley*, 524 Fed. Appx. 963, 970 (5th Cir. 2013).
[167] 843 F.3d at 178.
[168] Dkt. No. 35 p. 71.
[169] *Hyatt*, 843 F.3d at 178.

defendant that he was "very depressed."[170] These important factors are absent from the present case, and thus *Hyatt* is inapplicable.

Plaintiffs cite another Fifth Circuit case which is also distinguishable: *Partridge v. Two Unknown Police Officers Of Houston*.[171] *Partridge* was published in 1986—ten years before the Fifth Circuit's ruling in *Hare*[172] crystalized the current two-step § 1983, Fourteenth Amendment Due Process analysis,[173] which provides that a municipality cannot be liable absent proof that particular municipal actors were subjectively and deliberately indifferent (in the episodic act or omission context). Thus, the *Partridge* Court did not analyze whether any particular municipal actor acted with subjective and deliberate indifference, instead focusing exclusively on the second step in today's analysis—objective and deliberate indifference of the municipality.[174] Thus, it is not possible to extract from *Partridge* what facts might be sufficient to establish subjective and deliberate indifference of a particular municipal actor.

Even so, the decedent in *Partridge* was more obviously suicidal to observing municipal actors than Decedent was in the present case. In particular, the *Partridge* decedent: (1) exuded a fragile emotional disposition and was hysterical towards police;[175] (2) carried mental and medical bracelets and cards such that officers knew he required additional medical supervision;[176] (3) became agitated and violent, kicking against the windows and door inside the police vehicle;[177] (4) intentionally struck his head against the plexi-glass divider in the police vehicle;[178] (5) required a

---

[170] *Id*. pp. 175–176.
[171] 791 F.2d 1182, 1184 (5th Cir. 1986).
[172] *Hare v. City of Corinth, Miss.*, 74 F.3d at 647 (5th Cir. 1996).
[173] The Court notes, however, that the basis for the first step of the analysis—subjective deliberate indifference of particular municipal officers—was developed by the Supreme Court as early as 1977 in *Farmer v. Brennan*, 511 U.S. 825, 833 (1994).
[174] *Partridge v. Two Unknown Police Officers of City of Houst., Tex.*, 791 F.2d 1182, 1188–89 (5th Cir. 1986).
[175] *Id*. p. 1184.
[176] *Id*.
[177] *Id*.
[178] *Id*.

two-man back-up unit to subdue and contain;[179] (6) was known by the police department generally as a mental patient;[180] (7) decedent's father told police that the decedent had previously suffered a nervous breakdown;[181] and (8) although the booking agents specifically were not aware, the decedent had previously attempted suicide during an earlier confinement.[182] None of these weighty factors are present here, and thus, *Partridge* is inapplicable.

### b. *Esmerelda Estrada—sergeant on duty*

If a lack of evidence dooms any allegation against Silva, then the same must be true of Estrada—there is even less evidence concerning her knowledge of or interactions with Decedent. The evidence indicates that Estrada arrived at Decedent's residence one minute after Silva did.[183] Silva did not need authorization from Estrada to arrest Decedent, so it appears Estrada showed up largely to assist Silva.[184] Veronica testifies that she told "the female officer"—Estrada—that she was afraid Decedent might hurt himself.[185] Unlike Silva, however, there is no evidence Veronica told Estrada that she was afraid for Decedent's life.[186] The record is otherwise silent with regard to Estrada's role.

The Court cannot reasonably infer from this scant evidence that Estrada acted with subjective and deliberate indifference towards a known, substantial risk that Decedent would commit suicide. As already noted with regard to Silva, Estrada could not reasonably infer that Decedent would kill himself based solely upon Veronica's statement that she was afraid

---

[179] *Id.*
[180] *Id.* at 1184.
[181] *Id.*
[182] *Id.*
[183] Dkt. No. 35-8 pp. 40–41.
[184] *Id.* p. 40 (indicating Silva did not need authorization to arrest Decedent).
[185] Dkt. No. 35-3 p. 83.
[186] *Id.* p. 25 (Veronica potentially made this statement to a *male* officer: "And then *he* told me, [y]ou want to press charges? I told him, [n]o. I loved him. I loved him. I feared for his life.") (emphasis added).

Decedent might harm himself.[187] "Harm" and "kill" are two different things. Moreover, there is no evidence that Veronica explained why she believed Decedent might harm himself. Under the circumstances, even assuming Estrada ignored Veronica's concern, a fact finder could not reasonably infer from the available evidence that this response indicates a subjective intention that Decedent commit suicide.[188] Importantly, Silva had custody of and booked Decedent, and there is no evidence Estrada was involved in this process. Thus, Estrada was not subjectively and deliberately indifferent.

At this juncture, the Court observes that there is no evidence that Silva or Estrada told anybody else about Veronica's statement that she was afraid Decedent might hurt himself. In fact, the evidence affirmatively suggests that they did not.[189] This is important because it is one *less* thing subjectively engrained in other employees' minds from which the Court might infer those other employees were subjectively and deliberately indifferent towards Decedent's constitutional rights.

### c. *Esteban Garza—jailer*

No fact finder could reasonably infer from the evidence that Garza was subjectively and deliberately indifferent to a known, substantial risk that Decedent would commit suicide. As noted, Garza showed up to work on the morning in question at 8:00 a.m.,[190] approximately two hours after Decedent was booked and at least one hour after Silva, the arresting officer, had left the Jail because his shift was over.[191] Nobody informed Garza that Decedent was in custody, and

---

[187] *See Hyatt v. Thomas*, 843 F.3d 172, 178 (5th Cir. 2016).
[188] *Sanchez v. Young Cty., Tex.*, 866 F.3d 274, 280 (5th Cir. 2017); *Estate of Allison v. Wansley*, 524 Fed. Appx. 963, 970 (5th Cir. 2013).
[189] *See* Dkt. No. 35-8 p. 89 (indicating Silva had no contact with any Donna jailers); *id.* p. 52 (Silva did not leave any information about Decedent's mental state in electronic database —"RFS"—from which other employee's might draw an inference that Decedent was suicidal); *id.* pp. 52–53 (Silva did not know who was in charge of Decedent after Silva left within an hour after booking Decedent).
[190] Dkt. No. 35-10 p. 13.
[191] Dkt. No. 35-8 p. 60.

Garza states that he only discovered Decedent by looking in the cells himself.[192] Garza also states that he knew Decedent from elementary and high school,[193] that they would meet at the carwash sometimes,[194] and that he considered Decedent a "friend."[195] There is no evidence Garza knew Veronica was concerned for Decedent's safety.

Garza claims he performed a cell check on Decedent at 8:10 a.m.[196] Plaintiffs hotly contest this fact. Even assuming no cell check was made, Garza did hear Decedent making noises in his cell, but did not know exactly what the noises were.[197] Video footage shows Decedent intermittently hitting and kicking the metal mesh screening of his Jail cell door.[198] Footage also shows that after arriving to work at 8:00 a.m., Garza was working on signs to mount in the jail.[199] ICE agents arrived at the Jail at 8:48 a.m., checked the cells at 8:49 a.m., and discovered Decedent hanging in his cell.[200]

Notably lacking is any evidence that Garza was subjectively aware of facts from which he could reasonably infer a substantial risk that Decedent was about to kill himself.[201] There is no evidence suggesting Garza even knew anyone was in the cell until he supposedly made a cell check at 8:10 a.m. Assuming the cell check did not occur, as Plaintiffs contend, then it suggests Garza had no basis for believing Decedent was suicidal, except for Decedent's noise-making. However, the mere fact Decedent was intermittently hitting the metal mesh of his cell door is not

---

[192] Dkt. No. 35-10 p. 15.
[193] *Id*. p. 29.
[194] *Id*. p. 37.
[195] *Id*.
[196] *Id*. pp. 30.
[197] *Id*. pp. 84 & 86.
[198] *See* Exhibit A-19 "Jail cell" footage.
[199] *Id*. "booking room" footage; Dkt. No. 35-10 p. 111.
[200] *See* Exhibit A-19 "booking room" footage. ICE arrival is timestamped at "9:55.01 a.m." and ICE agents enter the cell block at "9:56:46 a.m." Plaintiffs' briefing indicates this time stamp is one hour and seven minutes off. *See* Dkt. No. 35 p. 30.
[201] *See Hyatt v. Thomas*, 843 F.3d 172, 178 (5th Cir. 2016).

an obvious sign that he was about to *kill* himself—as opposed to simply being angry, intoxicated, bored, trying to get attention, or some combination of these or other issues.

For these reasons, no reasonable inference can be made that Garza was subjectively aware Decedent was likely to kill himself absent intervention.[202] There is also no evidence that Garza's failure to intercede was motivated by a "subjective intention that the [suicide] occur,"[203] as opposed to negligence, laziness, distraction via making signs, or even over-familiarity with noisy detainees. In sum, a fact finder could not reasonably infer from the evidence that Garza was subjectively and deliberately indifferent to a known, substantial risk that Decedent would commit suicide.

### d. Nathan Coronado—jailer

Plaintiffs do not expressly contend that Coronado, a jailer-in-training, was subjectively and deliberately indifferent.[204] For purposes of thoroughness, however, the Court will address Coronado's role. Coronado arrived at the Jail at about 8:00 a.m.—the same time as Garza.[205] There is no evidence Coronado knew about Veronica's concern for Decedent's safety. Like Garza, Coronado states that he and Garza checked on Decedent,[206] and specifically that he saw some water on the floor, was going to get a mop for Decedent to wipe up the water,[207] but that he never got the mop.

Coronado also states that he could generally tell if a detainee needed extra supervision because those detainees would expressly state that they might hurt themselves.[208] Coronado

---

[202] *Sanchez v. Young Cty., Tex.*, 866 F.3d 274, 280 (5th Cir. 2017); *Estate of Allison v. Wansley*, 524 Fed. Appx. 963, 970 (5th Cir. 2013).
[203] *See id.*
[204] *See* Dkt. No. 35 pp. 71–77 (specifically listing the employees Plaintiffs believe were subjectively and deliberately indifferent. None of which includes Coronado).
[205] Dkt. No. 35-7 p. 18.
[206] *Id.* p. 37.
[207] *Id.* p. 47.
[208] *Id.* p. 61.

attests that previous detainees had specifically stated their intent to harm themselves.[209] There is no evidence that Decedent expressed to Coronado any intent to harm himself, and Coronado's observation of Decedent was that he was "reasonable" but "hyper."[210] In retrospect, Coronado admits that his and Garza's failure to more closely monitor Decedent undermined Decedent's safety.[211] However, there is no evidence Coronado had this conviction and failed to act on it *during the morning Decedent killed himself.*

Given the available evidence, no fact finder could reasonably infer that Coronado was aware of facts from which an inference of a substantial risk of suicide could be drawn.[212] No doubt, Coronado heard Decedent's yelling and banging, but Coronado could not reasonably infer from this fact that Decedent was about to kill himself. If Coronado made a cell check at 8:10 a.m., then Coronado also saw the water on the floor in Decedent's cell (suggesting Decedent's odd behavior that morning), as Coronado testifies he did. But this does not meaningfully tip the scales in Plaintiffs' favor, as a cell check would also indicate a subjective intent to help Decedent. If Coronado did not check Decedent's cell, as Plaintiffs contend, then he had no subjective basis for believing Decedent was suicidal, knowing little or nothing about Decedent except that he was noisy and rowdy.

In sum, it cannot reasonably be inferred from the available evidence that Coronado was subjectively aware Decedent was about to kill himself. In turn, Coronado's lack of special supervision or intervention does not indicate a subjective intention that Decedent commit suicide.[213] Thus, Coronado did not act with subjective and deliberate indifference.

---

[209] *Id*. p. 63.
[210] *Id*. p. 86.
[211] *Id*. p. 9.
[212] *See Hyatt v. Thomas*, 843 F.3d 172, 178 (5th Cir. 2016).
[213] *Sanchez v. Young Cty., Tex.*, 866 F.3d 274, 280 (5th Cir. 2017); *Estate of Allison v. Wansley*, 524 Fed. Appx. 963, 970 (5th Cir. 2013).

### e. Minerva Perez—Communications Officer

Like Coronado, Plaintiffs do not explicitly contend that Perez was subjectively and deliberately indifferent.[214] The Court nevertheless addresses Perez's role for the sake of thoroughness. As previously noted, Perez fulfilled multiple duties, including answering 911 calls,[215] dispatching police officers and the fire department where they were needed,[216] as well as monitoring the video feed from the Jail cells[217] (which is no small task given the sixteen different video feeds).[218] However, Perez believed that her duty to monitor detainees ended when jailers were on duty since they could watch the detainees.[219]

Perez was unaware of facts from which a reasonable inference of a substantial risk of suicide could be drawn.[220] There is no evidence she knew anything about Decedent's mental state. She never directly interacted with Decedent, and thus he never told her he intended to harm himself. After 8:00 a.m. (when Garza and Coronado arrived), Perez stopped monitoring Decedent altogether, and thus could not have been subjectively aware of any risk of suicide that Decedent's behaviors might have projected. Because Perez was unaware of facts from which a substantial risk of suicide could be drawn, a fact finder could not reasonably infer that she *actually* drew any such inference.

Moreover, based upon the available evidence, a fact finder could not reasonably infer that Perez's dereliction of her duty to monitor indicated a subjective intention that Decedent

---

[214] *See* Dkt. No. 35 pp. 71–77 (specifically listing the employees Plaintiffs believe were subjectively and deliberately indifferent, none of which includes Coronado).
[215] Dkt. No. 35-9 pp. 26–27.
[216] *Id*.
[217] *Id*. p. 42.
[218] *See* Dkt. No. 35-4 p. 19.
[219] *Id*. pp. 37 & 40.
[220] *See Hyatt v. Thomas*, 843 F.3d 172, 178 (5th Cir. 2016).

commit suicide.[221] Rather, it appears that Perez did not believe monitoring was necessary since jailers could monitor Decedent, and also that she was busy answering 911 calls, although the exact number of those calls is disputed. In sum, Perez did not act with subjective and deliberate indifference.

### f. Police Chief Ruben De Leon

Ruben ordered the purchase and posting of at least one, and possibly two signs for the Jail. The first sign reads "Welcome to the Donna Hilton," and it is undisputed that Ruben authorized the purchase of this sign.[222] The second sign contains a Punisher decal. Although Coronado suggests this sign was ordered at Ruben's request,[223] Ruben himself denies this.[224] Regardless, Plaintiffs contend that Ruben was deliberately indifferent to Decedent's suicidal tendencies by ordering the posting of (at least one) sign, thus distracting Garza and Coronado and preventing them from intervening in Decedent's suicide.[225]

No reasonable fact finder could determine that Ruben was subjectively and deliberately indifferent towards a known, substantial risk Decedent would commit suicide. There is no evidence suggesting Ruben even knew Decedent was being held at the Jail that morning, or that he ordered the sign(s) to be prepared for the Jail during the time Decedent was being held. It is thus impossible to infer that Ruben knew of any resulting risk to Decedent, or that Ruben intended Decedent to kill himself as a result of the posting of the signs. Indeed, Ruben testified that Decedent was a "personal friend,"[226] that Decedent would sometimes wash Ruben's car,[227]

---

[221] *Sanchez v. Young Cty., Tex.*, 866 F.3d 274, 280 (5th Cir. 2017); *Estate of Allison v. Wansley*, 524 Fed. Appx. 963, 970 (5th Cir. 2013).
[222] *See* Dkt. No. 35-4 p. 112.
[223] *See* Dkt. No. 35-7 p. 49.
[224] Dkt. No. 35-4 p. 112.
[225] *See* Dkt. No. 35 pp. 80–81.
[226] Dkt. No. 35-4 p. 45.
[227] *Id.* p. 61.

that he would give Decedent money to buy pizza,[228] and that they would converse about Decedent's family.[229] Ruben states: "The guy was a friend of mine, and I knew [him] for quite some time. And it really bothered me that he took his life."[230] In sum, Ruben was not subjectively and deliberately indifferent.

At this juncture, the Court has determined that none of Defendant's employees who were directly involved in the activities which took place on February 19, 2016 acted with subjective and deliberate indifference *up to the point in time at which Decedent was found hanging in his cell*. However, Plaintiffs also contend that episodic acts and omissions occurred after Decedent was found hanging in his cell which support § 1983 liability.[231] The Court now turns to this contention.

### iii.     *Analysis—episodic acts or omissions after finding Decedent hanging in his cell*

No reasonable fact finder could conclude that Defendant's employees were subjectively and deliberately indifferent based upon their actions after Decedent was discovered hanging in his cell. Plaintiffs set forth three contentions in this regard, which the Court addresses in turn.

*First*, Plaintiffs point out that when placing the 911 call for medical assistance, Perez mispronounced the word "hanged," such that it was not clear what Decedent's medical needs actually were.[232] From this mispronunciation, Plaintiffs infer that Perez was intoxicated,[233] and the paramedics believed they had been called for a tongue bite.[234] However, if Perez's mispronunciation was caused by intoxication, then it was *not* caused by an intent that Decedent die or otherwise suffer—i.e., subjective and deliberate indifference. Thus, Perez was not

---

[228] *Id*.
[229] *Id*.
[230] *Id*. p. 62.
[231] *See* Dkt. No. 35 pp. 35–37 & 87–89.
[232] *Id*. pp. 35–36.
[233] *Id*.
[234] *See* Dkt. No. 35-23 p. 6.

subjectively and deliberately indifferent to Decedent's known medical needs because she mispronounced the word "hanged."

*Second*, Plaintiffs contend that Defendant's employees did not take "any steps to perform CPR on Decedent, or otherwise render first aid."[235] This is not entirely true. The evidence shows that two jailers entered the cell block with keys within seven seconds of hearing from the ICE agents that Decedent hung himself.[236] Thirty-nine seconds later, and presumably while Decedent's body was being cut down, a jailer—most likely Coronado—reentered the booking room, possibly to request medical assistance.[237] Sixteen seconds later, Decedent's body was brought to the booking room—closer to the Jail exit.[238] For another sixteen seconds, ICE agents and jailers hunched over Decedent's body for examination, while one of those jailers spoke into his radio, presumably to call for medical assistance.[239] Suarez arrived and began CPR exactly thirty seconds later.[240] During this thirty second interval, the ICE agents and jailers did not administer CPR.

Given the circumstances, no reasonable fact finder could conclude that Defendant's employees were subjectively and deliberately indifferent to Decedent's serious medical needs by virtue of their failure to administer CPR for thirty seconds. The events *before* and *after* this thirty-second failure to administer CPR do not suggest Defendant's employees intended that Decedent die or otherwise suffer. After being notified of Decedent's hanging, the jailers immediately took steps to call for medical assistance, as well as to get Decedent's body out of

---

[235] *Id*. p. 35.
[236] Exhibit A-19 "booking room" footage at "9:57:04 a.m." – "9:57:11 a.m."
[237] *Id*. at "9:57:50 a.m." *See* Dkt. No. 35-7 p. 78 (indicating Coronado called dispatch to in turn request an ambulance).
[238] *Id*. at "9:58:06 a.m."
[239] *Id*. at "9:58:06 a.m." – "9:58:22 a.m."; Dkt. No. 35-10 p. 98 (indicating that by the time Decedent's body was brought into the booking room, Garza had requested emergency medical services); Dkt. No. 35-7 pp. 77–78 (indicating Garza called dispatch who in turn called an ambulance).
[240] Exhibit A-19 "booking room" footage at "9:58:52 a.m."

the cell and closer to the exit. Decedent's body appeared lifeless, and it was not clear whether he was still alive.

After Suarez began CPR, another employee—Lieutenant Rosas ("Rosas")—[241] encouraged Suarez to "do the pressure,"[242] notified Suarez that Decedent had thrown up,[243] helped Suarez place Decedent on his side,[244] assisted Suarez to clear Decedent's mouth of any obstructions,[245] and took over CPR when Suarez became too tired to continue.[246] There was no room for anybody else in the room to assist Suarez and Rosas. In sum, the actions of Defendant's employees before and after the thirty-second failure to provide CPR suggest they were intent on helping, not hurting Decedent.

Although there is no *good* explanation for the jailers' failure to administer CPR for thirty seconds (it may have amounted to negligence), any normally functioning person, even one trained to do CPR, might have done the same thing for thirty seconds while waiting for somebody else to arrive and deliver CPR. There is no evidence in the record that any jail staff had previously administered CPR on a real person and under real circumstances. Thus, no fact finder could reasonably conclude that Defendant's jailers were subjectively and deliberately indifferent to Decedent's serious medical needs.

*Third*, Plaintiffs contend that Defendant's "Senior Police Department officers" failed to cooperate with paramedics. Video footage indicates that upon arriving, one of the emergency responders—Frank Tafolla ("Tafolla")—asked those in the booking room "what happened? Did he say anything?"[247] Evidently, Tafolla was told (by other people) that he was responding to a

---

[241] *See* Dkt. No. 35-21 p. 12.
[242] Exhibit A-24 at "31."
[243] *Id*. at "45."
[244] *Id*. at "49.
[245] *Id*. at "54."
[246] *Id*. at "1:38."
[247] *Id*. at "2:26."

tongue bite, not a hanging.[248] As he began asking questions, Rosas—the person performing CPR at the time—told Tafolla "Dude . . . put the air bag on him and let's go."[249] Tafolla asked how many chest compressions had been completed,[250] and Suarez responded "we've done maybe about ten cycles."[251] The majority of Tafolla's time was spent unwrapping and preparing equipment, as well as issuing orders. After Suarez took back over doing CPR, he noticed that it was taking medical responders a significant amount of time to set up the defibrillator and stated: "Hey get somebody that knows how to f***** work this thing. Plug that motherf***** in."[252] Tafolla left with Decedent without asking any more questions.

No fact finder could conclude from the available evidence that any senior Police officers were subjectively and deliberately indifferent towards Decedent by virtue of failing to cooperate with the medics. The only evident senior Police officers in the room were Suarez and Rosas, both of whom took turns vigorously performing CPR on Decedent in an attempt to save his life. Suarez was trying to hurry the medics to save Decedent's life. When asked how many chest compressions had been completed, Suarez gave a specific answer. From the video, the only questions senior Police officers did not answer were "what happened? Did he say anything?" These questions were met by Suarez with a command to start preparing medical equipment— demonstrating Suarez's awareness of how dire the situation was, and his ostensible desire to maximize Decedent's chance of living. In sum, no reasonable fact finder could conclude from the evidence that Defendant's employees were subjectively and deliberately indifferent towards Decedent based upon their actions after finding him hanging in his cell.

---

[248] Dkt. No. 35-23 p. 4.
[249] Exhibit A-24 at "2:28."
[250] *Id*. at "2:50."
[251] *Id*. at "3:00."
[252] *Id*. at "4:32."

Even assuming the very worst of Defendant's employees—i.e., that their actions and omissions in the less than two minute time frame were committed with subjective deliberate indifference, there is an independent reason liability cannot lie under § 1983. *There is no evidence that Decedent was alive when the ICE agents found him.* Indeed, Plaintiffs openly admit in their briefing that "[i]t is simply unknown whether, at the time of discovery of his suicide attempt, Decedent was then deceased and/or beyond resuscitation via prompt medical aid."[253] Upon arriving at the Jail, Tafolla observed that Decedent was "cyanotic," meaning blue and pale.[254] Tafolla's defibrillator indicated that Decedent was dead, and thus recommended against administering any shock.[255] The subsequent autopsy did not suggest any particular time of death.[256]

It is important whether Decedent was alive at the time he was found hanging in his cell. If Decedent was dead by this time, then from that time and moving forward, he had no constitutional right not to be denied, by deliberate indifference, attention to his "serious medical needs."[257] Deceased persons *have no medical needs*. As a logical consequence, it is impossible for Defendant's employees' alleged subjective and deliberate indifference to have had any object (i.e. such as Decedent's medical needs or suicide risk). Thus, a lack of proof that Decedent was alive during the relevant time period amounts to a lack of proof that Decedent had any predicate constitutional right, or that any such right was violated. For all these reasons, § 1983 liability cannot lie against Defendant for its employees actions after they discovered Decedent's hanging body.

---

[253] Dkt. No. 35 p. 34.
[254] Dkt. No. 35-23 p. 5.
[255] *Id*. p. 8.
[256] *See* Dkt. No. 35-2.
[257] *Estate of Pollard v. Hood Cty., Tex.*, 579 Fed. Appx. 260, 265 (5th Cir. 2014).

### iv. *Analysis—condition-of-confinement theory*

Plaintiffs argue that the present case can properly be categorized as a condition-of-confinement action,[258] which amounts to "a constitutional attack on the general conditions, practices, rules, or restrictions of confinement."[259] In order to prevail on a condition-of-confinement theory, the claimant must establish:

> (1) a rule or restriction or . . . the existence of an identifiable intended condition or practice . . . or that the [J]ail official's acts or omissions were sufficiently extended or pervasive; (2) which was not reasonably related to a legitimate governmental objective; and (3) which caused the violation of a detainee's constitutional rights.[260]

If a claimant properly complains of a condition of confinement, "the court assumes that by the municipality's promulgation and maintenance of the complained of condition, the municipality intended to cause the alleged constitutional deprivation."[261] As one can imagine, this theory of liability is inherently attractive to claimants because it ostensibly lowers their evidentiary burden as no mens rea is required.

However, the Fifth Circuit "has not permitted plaintiffs to conflate claims concerning a prison official's act or omission with a condition-of-confinement complaint."[262] True condition-of-confinement actions do not "implicate the acts or omissions of individuals," but instead focus on the system of delivering services to pretrial detainees.[263] One particular Fifth Circuit case is instructive. In *Flores*—involving a pretrial detainee suicide—the claimant attempted to obtain relief under both an episodic act or omission theory, as well as under a condition-of-confinement

---

[258] *See* Dkt. No. 35 p. 110.
[259] *Anderson v. Dallas Cty., Tex.*, 286 Fed. Appx. 850, 857 (5th Cir. 2008).
[260] *Montano v. Orange Cty., Tex.*, 842 F.3d 865, 874 (5th Cir. 2016).
[261] *Anderson*, 286 Fed. Appx. at 857.
[262] *Id.* (emphasis added).
[263] *See Estate of Henson v. Wichita Cty., Tex.*, 795 F.3d 456, 463 (5th Cir. 2015) (citing *Shepherd v. Dallas Cty.*, 591 F.3d 445, 453 (5th Cir. 2009)).

theory.[264] To support the episodic act or omission theory, the claimant pointed to specific acts and omissions of the sheriff.[265] To support the condition-of-confinement theory, the claimant pointed to specific policies and systemic failures, such as: the provision of dangerous inmate supplies to detainees, inadequate suicide detection, inadequate suicide intervention, inadequate training, and inadequate staffing.[266] Nevertheless, the *Flores* Court held: "[I]t is clear [in light of previous Fifth Circuit rulings] that this is an episodic act or omission case."[267]

Discussing *Flores*, the Fifth Circuit subsequently explained in *Anderson*—another pretrial detainee suicide case—that "[w]here the sheriff's action [was] *interposed* between the county and the decedent, it was clear that the case was one for an episodic act or omission."[268] To support its condition-of-confinement theory, the claimant in *Anderson* complained of inadequate funding of jail staff, actual inadequate staffing, inadequate monitoring of Jail operations, and inadequate provision of medical care at the jail.[269] The *Anderson* claimant also submitted county and Department of Justice reports directly supporting these contentions.[270] Nevertheless, the *Anderson* Court held that the claim before it was one for acts and omissions, not conditions of confinement:

> The state actors were still *interposed between the detainee and the municipality*, such that the detainee complains first of a particular act of, or omission by, the actor and then points derivatively to a policy, custom, or rule (or lack thereof) of the municipality that permitted or caused the act or omission.[271]

---

[264] *Flores v. Cty. of Hardeman*, Tex., 124 F.3d 736, 738 (5th Cir. 1997).

[265] *Id*.

[266] *See id*. at 739 ("Plaintiffs' claim that Hardeman County has a policy or practice of inadequate suicide detection, intervention, and prevention, inadequate training and staffing, and unacceptably dangerous inmate supplies, i.e. a blanket with holes in it, that was torn into strips and used by Flores to hang himself."); *see also id*. at 738 ("The plaintiffs here have attempted to plead both an 'episodic' case (based on Ingram's acts and omissions) and a 'conditions' case (based on training and staffing policies in Hardeman County").

[267] *Id*. at 738.

[268] *Anderson v. Dallas Cty. Tex.*, 286 Fed. Appx. 850, 858 (5th Cir. 2008) (emphasis added).

[269] *Id*.

[270] *Id*.

[271] *Id*. (quoting *Scott v. Moore*, 114 F.3d 51, 53 (5th Cir. 1997).

By nature, pretrial detainee suicide cases almost always involve some actor interposed between the detainee and the municipality, such that the complaint first points to the actor and then derivatively to a municipal policy or lack thereof. Thus, one district court tellingly noted in 2009 that "[t]he reported cases in the Fifth Circuit uniformly hold that inmate suicides involve episodic act or omissions claims."[272] Neither party appears to have cited, and the Court cannot find, any binding authorities in which a pretrial detainee suicide action was classified as one for conditions of confinement.

On the whole, the present case cannot properly be classified as one for conditions of confinement. Plaintiffs point to the individual failures of *Defendant's employees*, thus interposing those employees between Decedent and Defendant. For example, and specifically in the "conditions[-]of[-]confinement" portion of their briefing (and elsewhere), Plaintiffs contend that:

- *Garza* and *Coronado* failed to make timely cell checks on Decedent because they were busy complying with an alleged policy to post signage (an order from Ruben),[273] and failed to ensure a cell check was conducted on Decedent every hour in compliance with official policy.[274]

- *Silva* and *Estrada* ignored Veronica's warnings that she was afraid for Decedent's safety and to relay such information to Jail employees.[275]

- *Perez* failed to adequately monitor Decedent via video feed, either pursuant to unofficial policy or custom, or otherwise because she was negligent or intoxicated.[276]
- *Garza, Coronado,* and *other employees* failed to perform CPR on Decedent's body while waiting for someone else to arrive and perform CPR.[277]

---

[272] *Hetchler v. Rockwall Cty., Tex.*, 2009 WL 1160284, at *4 (N.D. Tex. Apr. 27, 2009).
[273] *See e.g., id.* pp. 10.
[274] *Id*. pp. 79 & 114.
[275] *Id*. pp. 21–22 & 114.
[276] *See e.g., id.* pp. 86–87, 104–105, 114–115.
[277] *Id*. pp. 35, 114–115.

- *Suarez* and *Rosas* failed to adequately cooperate with emergency medical responders.[278]

The beating heart of Plaintiffs' case "implicates the acts or omissions of individuals,"[279] and interposes those individuals between Decedent and Defendant, taking aim at Defendant derivatively. Thus, on the whole, this is an episodic act or omission case, not a condition-of-confinement case.

Nevertheless, one particular complained-of policy jumps out without the interposition of any individuals: Defendant's officers and jailers are not trained to pre-screen every arrestee/detainee;[280] rather, they are trained to detect medical and psychological conditions as they arise and then turn to health professionals in the event such expertise is needed.[281] While "[n]o decision of [the Supreme Court] even discusses suicide screening or prevention protocols,"[282] the Fifth Circuit in *Burns* held that pretrial detainees have no "absolute [constitutional] right to psychological screening."[283] In *Evans*, the Fifth Circuit reaffirmed *Burns*, and stated: "the failure to train custodial officials in screening procedures to detect latent suicidal tendencies does not rise to the level of a constitutional violation."[284] Here, insofar as Defendant's policy might constitute a condition of confinement—it is not clear that it does—it cannot be said that Decedent had an absolute constitutional right to suicide screening in the first instance, or that he demonstrated any obvious suicidal tendencies prior to booking that might require a suicide screening.

Even so, Plaintiffs bear the burden to satisfy each element of a condition-of-confinement claim, including that the policy in question had no rational, non-punitive basis, and that not

---

[278] *Id.* pp. 36–37, 87–9, 115.
[279] *Estate of Henson v. Wichita Cty., Tex.*, 795 F.3d 456, 463 (5th Cir. 2015).
[280] Dkt. No. 35-4.
[281] *See* Dkt. No. 33 p. 5; Dkt. No. 35-4 pp. 27–28 & 40–41.
[282] *Taylor v. Barkes*, 135 S. Ct. 2042, 2044–45 (2015).
[283] *Burns v. City of Galveston, Tex.*, 905 F.2d 100, 104 (5th Cir. 1990).
[284] *Evans v. City of Marlin, Tex.*, 986 F.2d 104, 108 (5th Cir. 1993).

universally providing suicide screenings caused Decedent's suicide. Plaintiffs have not provided any such evidence. Although Plaintiffs' expert's report indicates that failure to provide universal suicide screening is not an "acceptable"[285] practice, this does not mean that it had no rational basis. Such is a question of law,[286] and thus not subject to the opinions of any fact expert.

Ultimately, there is a rational basis for Defendant's policy. Defendant's Jail is a short-term holding facility where—unlike a county jail or state prison—detainees do not stay long,[287] and they thus have significantly less time to commit suicide. Ruben indicates that "we're really shooting at six hours or less."[288] It served purpose of economy during the pendency of such short stays to refrain from suicide screenings until it appeared to officers or jailers that there was a real need for such an examination. Indeed, this strategy appears to have been effective, because no one previously committed suicide in the Jail during its entire existence, a span of forty-five years.[289] Under these unique circumstances, Defendant's policy cannot properly be characterized as "punitive," and without any rational basis.

Plaintiffs also fail to provide any evidence from which the Court can reasonably infer causation—that universal suicide screenings would have prevented Decedent's suicide. Plaintiffs' expert's report does conclude: "Had [Decedent] been screened, and responded affirmatively that he was thinking of self-harm or suicide, then that would have necessitated additional levels of observation and protocol implementation."[290] However, there is no way to know whether Decedent would have indicated he was thinking of suicide, and thus no way to know whether additional levels of observation and protocol would have been implemented, even

---

[285] Dkt. No. 35-12 p. 34.
[286] *Gaalla v. Citizens Med. Ctr.*, 407 Fed. Appx. 810, 814 (5th Cir. 2011) ("Whether a governmental action passes rational basis muster is a question of law that this court reviews de novo.").
[287] Dkt. No. 35-4 pp. 35.
[288] *Id.* p. 36.
[289] *Id.* pp. 42 & 45.
[290] Dkt. No. 35-12 p. 45.

assuming additional observation would have saved Decedent. In sum, Plaintiffs have not submitted evidence satisfying the necessary elements of a condition-of-confinement theory with regard to Defendant's policy to screen individuals on a case-by-case basis, rather than universally.

Generally speaking, Plaintiffs do not explain how their Fourteenth Amendment Due Process allegation arises from conditions of confinement, and they do not explain how each necessary element of such a claim is fulfilled. Rather, Plaintiffs briefly portend that Ruben's authorization of the "Punisher" and "Donna Hilton" signs indicates a general mistreatment of detainees.[291] This emphasis on the signs is misplaced for an obvious reason—there is no concrete causal relationship between them and Decedent's death. The signs were not posted at the time Decedent committed suicide and he could not see them, so they could not have directly influenced his decision to kill himself. Plaintiffs' suggestion that these signs indicate a general mistreatment of detainees is also insufficient for failure to specify the exact type of mistreatment supposedly behind Decedent's death.

The closest Plaintiffs come to tying the signage to Decedent's suicide is the contention that Ruben's authorization of the signs distracted Garza and Coronado from properly monitoring Decedent.[292] However, Garza and Coronado are still interposed between Decedent and Defendant such that an act or omission analysis would be proper. It is not clear from the evidence *when* Ruben expected the signs to be completed and posted, and there is no evidence that Ruben ordered Garza and Coronado to ignore Decedent in the process. With the undisputed background policy that there be one-hour cell checks, and the substantive *compatibility* of this policy with Garza and Coronado's authorization to post signs, Plaintiffs are effectively pointing

---

[291] Dkt. No. 35 p. 110.
[292] *Id*. pp. 10 & 33.

at Garza and Coronado, and then derivatively to Defendant. Plaintiffs cannot prevail on this basis for reasons already stated earlier in this opinion—Garza and Coronado were not subjectively and deliberately indifferent.

Finally, the Court notes that Plaintiffs' case is ineffective insofar as it rests upon the mere *negligence* of specific employees—acts or omissions which allegedly contributed to Decedent's suicide, yet not committed pursuant to any identifiable policy or custom. The Fifth Circuit has clearly stated:

> A municipality can be found liable under § 1983 only where the municipality *itself* causes the constitutional violation at issue, for example, by establishing an unconstitutional policy or custom. Because respondeat superior or vicarious liability will not attach under § 1983, the county cannot be vicariously liable for the alleged actions of its jailers or EMT's.[293]

In sum, Defendant's motion for summary judgment with regard to Plaintiffs' Fourteenth Amendment claim is hereby **GRANTED**.

## IV. HOLDING

For the foregoing reasons, Defendant's motion for summary judgment[294] is **GRANTED** in full. Moreover, because Plaintiffs' expert's report has no ultimate bearing on the outcome, Defendant's motion to disqualify and preclude Leach's testimony[295] is **DENIED AS MOOT**. A final judgment will issue separately.

IT IS SO ORDERED.

DONE at McAllen, Texas, this 15th day of December, 2017.

Micaela Alvarez
United States District Judge

---

[293] *Whitt v. Stephens Cty.*, 529 F.3d 278, 283 (5th Cir. 2008) (emphasis added).
[294] Dkt. No. 33.
[295] Dkt. No. 34.